2023 IL App (2d) 220050-U
Nos. 2-22-0050 & 2-22-0223 cons.
Order filed February 28, 2023

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

_____

| | | |
|---|---|---|
| *In re* MARRIAGE OF MARIO MAJEWSKI, | ) ) ) | Appeal from the Circuit Court of Lake County. |
| Petitioner-Appellee, | ) ) | |
| and | ) ) | No. 19-D-1167 |
| JOLANTA MAJEWSKI | ) ) ) | Honorable Ari P. Fisz, |
| Respondent-Appellant. | ) | Judge, Presiding. |

_____

JUSTICE SCHOSTOK delivered the judgment of the court.
Presiding Justice McLaren concurred in the judgment.
Justice Birkett concurred in part and dissented in part.

**ORDER**

¶ 1    *Held*:    The trial court did not err in barring respondent from raising a claim of dissipation, because her notice of intent to claim dissipation was untimely. The court's decision to permanently bar respondent from receiving maintenance was against the manifest weight of the evidence, because it misapprehended whether the parties had entered into an agreement as to maintenance. The trial court abused its discretion in failing to allocate certain tools and business accounts between the parties, but did not err in failing to allocate several businesses amongst the parties where the record contained no evidence that the petitioner held any interest in the businesses at the time of trial.

¶ 2    Respondent, Jolanta Majewski (Jolanta), appeals the judgment of the circuit court of Lake

County dissolving her marriage with petitioner, Mario Majewski (Mario). Specifically, Jolanta

appeals the trial court's decisions to bar her dissipation claims as untimely and to prevent her from receiving maintenance from Mario, as well as its allocation of marital property. We affirm in part, reverse in part, and remand for further proceedings.

¶ 3                                I. BACKGROUND

¶ 4    On July 29, 2019, Mario filed his petition for dissolution of marriage. According to the petition, the parties were married on July 21, 2001, and had one child together, named M.M.

¶ 5                           A. Pretrial Proceedings

¶ 6    On December 4, 2019, the trial court entered a case management order, providing that issues of dissipation—both by Mario and Jolanta—remained contested. The case management order further provided that "all discovery shall be completed not later than [January 14, 2021]."

¶ 7    On February 3, 2020, Jolanta filed a motion seeking access to the warehouse of the parties' marital business, Flood Specialists, arguing that the warehouse contained the parties' personal belongings, and that the contents therein should be inventoried, divided among the parties, and presumably sold to help cover legal costs. The motion also alleged that, as of September 2019, Mario held $294,000 in various bank accounts, which had since "disappeared." On February 6, 2020, the trial court entered an order granting Jolanta access to Flood Specialists for the sole purpose of inventorying the parties' belongings. On March 9, 2020, after the court had already granted Jolanta access to Flood Specialists, Mario filed his response to Jolanta's motion for access to the warehouse, denying that the warehouse contained any personal assets that could be sold. He further argued that the $294,000 in funds had not disappeared but were held in his "business accounts."

¶ 8    On July 2, 2020, Jolanta filed a petition for rule to show cause against Mario—her fourth such petition—seeking an explanation as to why he had not complied with one of the trial court's

earlier temporary support orders. Relevant here, the petition also suggested that, by liquidating certain of the parties' assets, Mario prevented Jolanta from being able "to retain experts and issue subpoenas to properly do the necessary financial discovery to trace the dissipation of the marital estate by [Mario] throughout these proceedings." On July 9, 2020, the trial court entered an order granting Jolanta's request to restrain Mario from "liquidating assets of the business without leave of court or written consent of [Jolanta]."

¶ 9     On August 25, 2020, the trial court modified the close of discovery to January 1, 2021.

¶ 10     On September 2, 2020, Mario filed his petition to modify and reduce support as well as his verified petition for interim and prospective attorney's fees and costs. On September 28, 2020, Jolanta filed her response to Mario's petition to modify, noting that "[l]arge amounts of funds keep disappearing from [Mario's] accounts *** since [s]ummer[ ]2019 without sufficient explanation." That same day, Jolanta also filed her response to Mario's petition for interim and prospective attorney's fees, alleging that Mario, who "has had sole access to all of the marital assets and funds," had spent "hundreds of thousands of dollars since Summer of 2019." The response further alleged that "it [was Mario's] dissipation, waste and hiding of marital assets that need[ed] to be explored through proper discovery that [Jolanta could not] afford without attorney's and expert attorney's fees being awarded." On September 29, 2020, the trial court entered an order allowing the parties to utilize funds acquired from the sale of the marital residence towards their attorneys' fees and denied Mario's petition to modify and reduce support.

¶ 11     Beginning in November 2020, some of the parties' miscellaneous filings alleged that Mario had been served with an eviction summons for Flood Specialists' warehouse. On November 20, 2020, a Cook County circuit court set an eviction date for the property for December 4, 2020.

¶ 12   On December 1, 2020, Jolanta filed a motion seeking to access and inventory assets contained in the warehouse—her third such motion—arguing that "[Mario was] allowing dissipation of the marital estate by allowing for a significant asset to be wasted." On December 2, 2020, two days before the impending eviction date, the trial court entered an order granting Jolanta's motion.

¶ 13   On December 28, 2020, Jolanta filed her second petition for interim and prospective attorney's fees and costs, arguing that, "[w]hile [Mario was] in a superior position to pay the attorney's fees and costs incurred by [Jolanta] in this litigation, [Mario] has dissipated the assets throughout 2019 and 2020 to claim to be destitute." As such, according to the petition, "[Jolanta] and counsel [were] preparing the Notice of Claim for Dissipation to file once discovery is complete."

¶ 14   On January 21, 2021, the trial court extended "[t]he financial discovery deadlines" to July 15, 2021.

¶ 15   On January 27, 2021, Mario filed a motion to compel Jolanta to sign an auction agreement with Flood Specialists' landlord "to assist with the sale of the property in the warehouse," presumably to satisfy Flood Specialists' debt in the eviction proceedings. On January 28, 2021, the trial court ordered that the auction agreement "shall proceed." On February 3, 2021, Mario filed a petition to modify and reduce support, which alleged that "Flood Specialists *** [was] no longer in existence, having been evicted from its warehouse location with the company property in the possession of the landlord," but that there was "an auction of the business property planned" for February 2021.

¶ 16   On June 14, 2021, after having already entered an allocation judgment as to the parties' parental responsibilities, the trial court ordered the matter to be continued to August 4, 2021, for

pretrial conference "on all remaining financial issues." On August 3, 2021, Jolanta moved to continue the parties' prospective trial date, which was set for August 30, 2021. In her motion, she argued that trial should be continued because Mario had failed to provide her with certain financial documents, because Mario had not timely responded to her earlier requests to supplement or amend discovery, and because various parties had not yet responded to subpoenas that she had issued, further frustrating her attempts to obtain discovery materials from them. Her motion made no mention of any incoming dissipation claims against Mario. On August 9, 2021, the trial court denied Jolanta's motion. It further specified that "[t]he deadline to conduct depositions [was] hereby extended to August 23, 2021, by agreement of the parties." As confirmed by Jolanta during oral arguments, no transcript of the August 9, 2021, hearing appears within the record.

¶ 17    On August 30, 2021, the day on which the parties' trial was scheduled, Jolanta filed her notice of intent to claim dissipation of marital property. Jolanta served the notice of intent to Mario's counsel on August 28, 2021, the Saturday preceding the parties' prospective trial date, which was to take place the following Monday. The notice of intent specified "three (3) types of dissipation" that Mario was allegedly engaged in: (1) "[c]ash withdrawals of large sums of money from various JPMorgan Chase bank accounts;" (2) "[c]heck payments made to *Platinum Touch Industries* [(Platinum Touch)];" and (3) "[t]he attorneys' fees and judgment of a breach of contract lawsuit in which verdict was entered against [Mario] and *Flood Specialists, Inc*., requiring payment of an aggregate sum over $200,000." (Emphasis in original). The notice of intent included a spreadsheet listing the purportedly dissipated assets, with the alleged instances of dissipation occurring between July 2017 and February 2020. As a result of Mario's alleged dissipation, Jolanta requested that the trial court "allocate [an] additional sum of, at least, $227,714.00 of marital funds to [Jolanta]."

¶ 18    Also on August 30, 2021, Mario filed a motion to bar Jolanta's dissipation claims, arguing that the notice of intent was untimely, as it was served to Mario "less than 48 hours before trial was to commence." Mario further pointed out that, prior to filing her notice of intent, Jolanta "had possession of bank records and financial information regarding 2017 and 2018 for many months and failed to make any allegations of dissipation even though represented by Counsel since the commencement of the case." That same day, Jolanta filed a motion to strike Mario's motion, arguing that that motion itself was untimely. Trial did not occur on August 30, 2021, as previously scheduled. The record does not provide any explanation as to the delay. On September 2, 2021, the trial court entered an order denying Jolanta's motion to strike and set trial for September 8, 2021.

¶ 19    On September 8, 2021, before the parties' trial began, the court heard arguments as to Mario's motion to bar Jolanta's dissipation claims. After hearing the parties' arguments, the court granted Mario's motion for two reasons. First, the court found that, pursuant to its December 4, 2019, case management order, discovery had closed on January 14, 2021. Because Jolanta's notice of intent was served to Mario over 30 days past that date, the court ruled that it was not timely under the Illinois Marriage and Dissolution of Marriage Act (Act) (750 ILCS 5/101 *et seq.*). Second, relying on "notions of fundamental fairness," the court found that it was prohibited from allowing "the notice of dissipation [to stand] because, again, it was filed two days before trial" was scheduled.[1] Acknowledging that it had since extended the trial date by "nine or ten days," the court nonetheless reasoned that the extra time "still [did not] allow [Mario] a proper of amount of time

---

[1] We presume the court meant to say that the notice of intent was *served* two days before trial was scheduled to begin.

considering all of the circumstances to respond to the notice of dissipation." Furthermore, the trial court found that, prior to the issuance of the August 9, 2021, order, Mario had already tendered to Jolanta all of the discovery documents that Jolanta's dissipation claims relied on.

¶ 20                                B. Trial

¶ 21    The matter promptly proceeded to trial. Mario was first called as a witness. He testified that he was currently self-employed as a handyman, but that he previously "helped people out with their disasters in their houses and businesses," in a reference to his earlier business, Flood Specialists. However, he was no longer involved in disaster relief, as he no longer had "any equipment, *** labor," or liability insurance. On top of that, the COVID-19 pandemic had a negative impact on his business and 2020 was a particularly "bad year for [him]," because his assets were frozen as a result of a 2017 lawsuit.

¶ 22    Mario testified that, since 2013, Flood Specialists had been primarily located in a 40,000 square-foot warehouse in Des Plaines, but that it had also maintained a satellite office in Florida, which closed in late 2019. Mario had been paying approximately $15,000 per month in rent for the Des Plaines warehouse prior to his eviction. To help cover rent, Mario allowed semi-trucks to park in Flood Specialists' lot for a fee. However, in the beginning of 2020, Mario had a dispute with the City of Des Plaines and ComEd, who precluded him from continuing to allow trucks to park on the property any longer.

¶ 23    After Flood Specialists' Florida satellite office had closed, all the equipment stored there was moved to the Des Plaines warehouse. A seizure order had been entered "for the assets in that warehouse," presumably during the Cook County eviction proceedings, and Mario's landlord "auctioned off" the entirety of Flood Specialists' equipment, including some of the parties'

personal property, which Mario had stored there. Any proceeds retained from the auction were placed in his counsel's trust account.

¶ 24    Mario testified that the 2017 lawsuit—which had been filed against Flood Specialists and himself individually—involved a breach of contract claim. The plaintiffs there had requested $1 million dollars' worth of damages before the matter proceeded to arbitration. Following arbitration, a judgment for $105,000 was entered against Mario. Mario paid this judgment out of "multiple accounts."

¶ 25    Aside from Flood Specialists, Mario had no other business interests, and he did not previously own any businesses that were sold since he initiated the instant dissolution action. He was aware of Platinum Touch, however, a company that was owned by Vince Zendusa.[2] While Mario had no ownership interests in Platinum Touch, he had previously planned to buy the company in 2017.

¶ 26    On cross-examination, Mario agreed that he started operating Flood Specialists during the marriage, and he also agreed that the company was therefore marital property. Jolanta asked whether "Flood Specialists [was] still an entity that [he] own[ed]." Mario responded, "Flood Specialists is basically—because, you know, the entity has been dissolved, so it's Flood Specialists like a [d/b/a]." When asked what Flood Specialists' fair market value had been, Mario expressed confusion, testifying:

> "I don't know. You know, you're referencing—I'm a little confused because, you know, there was the entity of Flood Specialists, Incorporated, and then, you know, there's now which is basically me. I'm a sole proprietor doing business as Flood Specialists. So

---

[2] Portions of the record inaccurately list Zendusa's name as "Vince Gendusa."

you're really confusing me when you're saying—you're asking me these questions because Flood Specialists, Incorporated, was during our marriage."

Upon further questioning, Mario testified, "I mean, we liquidated all the assets. So fair market value was what we received in—you know, what's in [counsel's trust] account, what we received at auction. But as of, you know, as of now, it really has no value." Concerning the auction, Mario admitted that he did not "auction off" some "basic tools" that he needed for "survival," which he estimated to be valued at $20,000.

¶ 27    Mario disagreed that he "at any point in time [had] any interest" in Platinum Touch. Jolanta referenced a deposition Mario gave on September 21, 2017, presumably as part of the 2017 breach of contract suit. During that deposition, Mario spoke of Platinum Touch, stating, "I didn't create [Platinum Touch]. I purchased it." Speaking of this prior statement, Mario testified that the purchase was never finalized because he found "skeletons in the closet" that made him reconsider things.

¶ 28    Jolanta began to question Mario as to "a number of checks" that Flood Specialists wrote to Platinum Touch in prior years, prompting an objection based on relevance. Jolanta indicated that her line of questioning was meant to elicit testimony showing that Mario "did indeed purchase a portion of [Platinum Touch]," and that his interest in the company constituted marital property. The court asked whether Jolanta had "some evidence that [Mario] actually purchased this business," and Jolanta responded, "There's a check that references payment down or down payment, one or the other, towards the business made by Flood Specialists." The court then responded, "Well, if you have any evidence showing that he actually bought the business, then that might make your previous question relevant, but at this point it's not relevant. The objection is sustained."

¶ 29    Jolanta asked Mario what his "business relationship *** with Platinum Touch" was during November 2016. Mario could not remember, but he denied that he was ever "a managing partner of Platinum Touch" during that time.  Mario agreed that Platinum Touch operated out of the same warehouse as Flood Specialists but denied that the businesses were intertwined. Platinum Touch did not pay any rent to Mario, although it did pay for certain utilities at the warehouse. In further compensation for rent, Platinum Touch "made their employees available on a 24-hours [*sic*] basis to Flood Specialists. So it was an agreement between [Zendusa and Mario]."

¶ 30    Jolanta questioned Mario more as to his earlier depositions from the breach of contract litigation. Specifically, Jolanta pointed out a May 2018 deposition, in which Mario described himself as a managing partner of Platinum Touch. Mario testified that his earlier description was based on a misunderstanding. Still, he acknowledged that, "at some point in time in the past five years," he had planned to purchase Platinum Touch for approximately $275,000. Mario denied making any payments towards that purchase price. He had, however, "paid [Platinum Touch] for certain services that were performed." Mario could not recall the "dollar value of the total payments" that were made.

¶ 31    In the May 2018 deposition, Mario had also been asked whether Zendusa sold him "half of Platinum Touch," and, at that time, he had responded, "Entire Platinum Touch." Again, Mario testified that his answer in that deposition was inaccurate.

¶ 32    Turning back to the September 2017 deposition, Jolanta presented Mario with transcripts in which he was asked about his rent arrangement with Platinum Touch. At that time, he had responded, " 'How do you charge yourself rent?' " Jolanta asked why Mario referred to Platinum Touch "as [him]self," but Mario could not recall giving this specific answer at the deposition.

¶ 33    Jolanta presented Mario with numerous checks that he had previously signed and made out to Platinum Touch, including: (1) a July 5, 2017, check for $2521; (2) a July 20, 2017, check in the amount of $2996; (3) a check from June 6, 2019, for $1121; (4) a check from June 13, 2019, for $824; (5) a check from June 24, 2019, for $802; (6) a check from July 1, 2020, for $2146; (7) a check from July 1, 2020, for $2475; (8) a check from July 9, 2020, for $1942; (9) a check from July 20, 2020, for $1942; (10) a check from July 20, 2020, for $2715; and (11) a check from November 9, 2017, for $32,235. Except for the November 9, 2017, check, Mario indicated that these payments were intended to compensate Platinum Touch "for the use of their employees" or "materials" that Flood Specialists had purchased. Regarding the November 9, 2017, check, which included the words, "PTI *** purchase paid out payment" on the memo line, Mario indicated that he had issued "partial payment" to Platinum Touch for their "efforts in Florida after a hurricane," implying that Platinum Touch's employees had performed certain work for him while Mario had been busy completing other repairs in Houston. Mario specified that the memo line included the word "purchase" because "[Platinum Touch] probably purchased, also, supplies that they needed, as well as anything that they needed down there [in Florida]."

¶ 34    Jolanta asked Mario about Marvin Green. He responded, "It's a company that Vince Zendusa owns. Or I don't know if he still owns it or not." Mario was unaware of the company's activities. Jolanta presented Mario with a statement from Mario's Robinhood trading account, which listed his email as "marvingreen@icloud.com." Jolanta asked, "If you have no connection with Marvin Green, why are you using a Marvin Green email address on your account?" Mario responded, "It's just a name." The Robinhood statement further listed Mario's employer as "Flood Specialists."

¶ 35     On redirect examination, Mario testified that he had never claimed any income from Platinum Touch on his 2017 or 2018 tax returns. After testifying, Mario rested his case.

¶ 36     Jolanta next testified that, at the time she arrived in the U.S. in September 2001, she had finished high school but did not "attend any post-high school education." In 2004 or 2005, she became employed as a teller at a currency exchange, and, after two years, she became a teller for MidAmerica Bank, where she was eventually promoted "to be a personal banker." She eventually became a personal banker for PNC Bank.  However, after M.M. was born in 2010, Jolanta stopped working. She remained unemployed up until the parties separated in 2019, except for some uncompensated work she had completed for Mario and Zendusa in 2018, which involved the "[s]taging of a house." Jolanta saw Zendusa as Mario's "best friend," whom he had known "since high school." After the parties had separated, Jolanta began working retail at a HomeGoods store for several months before she began working for Dovenmuehle Mortgage. There, she earned approximately $18 an hour, and was working at least 40 hours a week. In 2020, Jolanta received her real estate license, although she had never earned any income as a real estate agent. Jolanta agreed that she earned about $2200 a month in net income, while her rent obligations totaled over $2100 a month.

¶ 37     While discussing her financial affidavit, Jolanta testified that she listed Platinum Touch and Marvin Green as business interests "[b]ecause Mario was running those companies." According to Jolanta, "He was the brain of those operations." Jolanta testified that Marvin Green sold solar panels, and that the company was formed "to build houses in some kind of different way." Jolanta also recalled Mario traveling to California for training "for those kind of jobs." When asked what personal knowledge she had regarding Mario's interest in Marvin Green, Jolanta replied, "What I have heard." She clarified that she had often overheard Zendusa and Mario talking

about the company over the phone. According to Jolanta, the two spoke over the phone "[a]ll the time. Every day." Jolanta later specified that at least some of these conversations took place from May 2019 through July 2019. According to Jolanta, she overheard Mario and Zendusa discussing various topics, such as Mario purchasing a truck for Marvin Green, Mario's California trip, and construction "plots."

¶ 38     Jolanta's financial affidavit also listed "companies with Mario Majewski's interest," such as "MV Prop."[3] Jolanta testified that this specific company's name was created as an amalgamation of Mario's and Zendusa's first initials, and that the company was "supposed to flip houses." She further testified that MV Prop had purchased a Chicago house in 2018, and that they had sold it in 2019 for a profit. Mario had first paid for the home "from [the parties'] money," a fact that Jolanta had learned after scouring over certain statements from Chase Bank, which she did not specifically identify.

¶ 39     Jolanta testified that Platinum Touch was involved with "[c]onstruction," in that the company "was also doing floods with Mario." Jolanta testified that she lacked knowledge of any completed transaction to purchase Platinum Touch. When asked whether she had "any personal knowledge regarding [Mario's] alleged business interest" in Platinum Touch, she responded, "My understanding was like he runs the business." When asked what her basis for this understanding was, she answered:

> "Because [Zendusa] was calling him asking questions about the business, and all
> this money he was making. He was the one negotiating, talking to the insurance companies.

---

[3] The record alternates between identifying this company as "MV Pro" and "MV Prop." For the sake of consistency, we utilize the latter spelling of the company.

He was the one negotiating everything, the contracts. He was paying the employees. He was—this is what I heard. Okay?"

Jolanta further specified that she overheard conversations pertaining to Platinum Touch while Mario and Zendusa spoke over speaker phone, but she was unable to remember the date of any such conversation. Still, she understood that Zendusa was looking for partners in the business, and either he or Mario had told Jolanta that the two were business partners.

¶ 40    Towards the end of Jolanta's direct examination, her counsel moved to make an offer of proof concerning the amount of money that Mario had allegedly dissipated, but the request was denied by the trial court.[4] In doing so, the court noted that, in her notice of intent, Jolanta had already specified the amount of money that Mario had allegedly dissipated. Furthermore, the court reminded Jolanta that it "did not strike the notice of dissipation for any substantive reason." Instead, the court struck the notice for "a procedural reason in that [the court] found that it violated the statute as far as timeliness."

¶ 41    On cross-examination, Jolanta testified that she was only aware of one home that Mario had "flipped" in Illinois for MV Prop. Mario asked, "Is it possible that MV Prop was open just for the sole purpose of flipping that house of 20—that he was involved with MV Prop just for the purpose of the house flipping in 2018?" Jolanta responded, "I believe so." Jolanta testified that the proceeds from that house sale "went to Mario's income in January," but later testified that it was possible that Mario's proceeds "went into the house and Vince got his proceeds."

---

[4] During oral arguments, Jolanta argued that the trial court refused her request to make an offer of proof concerning the *merits* or her dissipation claims, but, as provided above, Jolanta had only requested to make an offer of proof determining the *amount of money* allegedly dissipated.

¶ 42 Concerning Marvin Green, Mario asked Jolanta whether she knew "if Mario ever *** built a house with Marvin Green." Jolanta responded, "Yes. With Marvin Green as a company, I don't know because this was—it was brand-new company." She further testified, "They built a house with Vincent Zendusa. They—in—back in 2000—started 2000, I believe, '17, '18, and sold it in 2019." When asked whether this was the same house that had allegedly been "flipped" by Mario for MV Prop, Jolanta sought to clarify herself, testifying:

"Okay. So again, Marvin Green was created to build houses in like different— different ways. Some green, I don't know—I don't know. Something about SubZero. This is another part, different kind of company. Okay? So Marvin Green *** is working with SubZero, something about building. I have no idea, and for sure, solar panels. Then we talking [*sic*] about Flood Specialist, it's floods, fires, disaster. Then we talk of Vincent and Mario Platinum Touch Construction. However, the house in Chicago, the house that they flipped it, they purchased it. They rebuild it, I would say. It was just purchased by Mario and Vincent, as in—like physical people, personal people, not entities, right? However, Flood Specialist and Platinum Touch, Marvin Green, whatever they had it, they all were working on this house, plus subcontractors."

¶ 43 Jolanta next called Adam Dubiel as a witness. Dubiel testified that he was previously employed by Flood Specialists, but that his employment had ended approximately a year and a half before trial, because "orders just stopped coming from [the company]." He identified Mario as his former, direct boss, and could not recall ever having completed any work for Platinum Touch while simultaneously working for Flood Specialists. Dubiel was unaware of whether the two companies had previously worked together in completing any specific construction jobs. He was also unaware of any business relationship between Flood Specialists and Platinum Touch, whether

Platinum Touch and Flood Specialists had previously shared the Des Plaines warehouse, or whether Flood Specialists' company vehicles included marketing logos from Platinum Touch. Because Dubiel was now employed as a subcontractor for Platinum Touch, he knew Zendusa, who was currently his boss. At the time of trial, he had been working for Platinum Touch for over a year. Dubiel had no knowledge of either MV Prop or Marvin Green.

¶ 44    Jolanta next called Corina Fala to testify. Fala, the owner of an accounting firm named Bigdill, Inc., had separately completed accounting work for Flood Specialists and Platinum Touch. When asked to elaborate on the "business relationship" between Flood Specialists and Platinum Touch, Fala testified, "I don't know what to say. What do you mean business relationship? They were, you know, sharing the same building as well as the relationship. Nothing else. I mean what do you mean?" Upon further questioning, Fala added, "There was no relationship." She further testified that she had never seen anything that suggested that Mario had any ownership interest in Platinum Touch. Fala was unaware of any business cards that contained both companies' logos, and the two companies maintained separate contracts for any completed work orders. She did not recall both companies' logos being on any company trucks.

¶ 45    Fala acknowledged that Mario was the owner of Flood Specialists, as he had signed checks on behalf of the business, which she had reviewed. She similarly acknowledged Zendusa as the owner of Platinum Touch, as he had signed all of that company's "checks, the bank statements, everything coming in, coming out." Fala testified that Flood Specialists would issue weekly checks to Platinum Touch as a "reimbursement" for "labor and material." Nonetheless, "all the [companies'] books were separate. They were in the same building[,] but everything was separate."

¶ 46    Fala was aware of MV Prop, describing it as "a company that was paying for the overhead of the building." She was unaware of what the "MV" in "MV Prop" represented. She provided

bookkeeping services for MV Prop, but "[o]nly for [their] credit cards," and not for "activity on the bank account or anything else." She did not know who owned MV Prop, because she did not have any access to that company.

¶ 47    Fala was also aware of Marvin Green, identifying it as a company Vince and "one of his friends" "were trying to open." She did not provide any accounting services to the company.

¶ 48    Jolanta next called Zendusa to testify. Zendusa testified that he owned Platinum Touch for "[r]oughly 15 years," and that the company provided "construction services." Jolanta asked him what type of professional relationship he shared with Mario, and he responded that the two men shared the Des Plaines warehouse from approximately 2016 to 2020. During that time, he did not pay rent to Mario, but he instead "helped him with other services." For example, Platinum Touch would provide "him labor when he needed it." In lieu of paying rent, Zendusa also paid for the warehouse's phone service, as well as for a "handful of other[]" utilities. Zendusa denied that he and Mario worked on any joint projects together under the same contract. Instead, at times, the two companies would separately "work on projects in which [Mario] provided the flood mitigation services and [Platinum Touch] provided construction services." In these circumstances, Mario would "contract the mitigation portion" of projects, while Zendusa would separately "contract the construction portion." Platinum Touch received weekly checks from Mario "for supplies or whatever it was[,] *** [n]ot for labor."

¶ 49    Zendusa denied that Mario had ever made an offer to purchase Platinum Touch. Jolanta presented Zendusa with a 2018 deposition transcript from an unrelated suit, in which he had previously agreed that he was "currently in the process of selling Platinum Touch" to Mario. Speaking of the deposition, Zendusa testified, "I do not recall that." He denied that he and Mario had ever reached a tentative purchase price for $275,000. Jolanta presented Zendusa with another

portion of the deposition transcript, in which he had previously agreed that " 'the purchase price for [Platinum Touch] [was] $275,000.' " Again, Zendusa testified that he could not recall his statements from that deposition.

¶ 50    Zendusa was next questioned as to the November 9, 2017, check that Platinum Touch had received from Flood Specialists. He maintained that Mario never paid him "any sum of money toward the purchase of Platinum Touch." Again, Jolanta presented Zendusa with the same deposition transcript, in which Zendusa had previously stated that he "[did] not recall" how much Mario had paid him thus far to acquire Platinum Touch." In the deposition, he had further agreed that "somebody [was] keeping track of that number," and that Mario was paying him " 'in regular increments' " for the company. Again, Zendusa did not recall his earlier statements from the deposition.

¶ 51    When asked whether Platinum Touch's "business cards with Flood Specialists display[ed] both logos of Flood Specialists and Platinum Touch," Zendusa answered, "Floods did. I had my own cards. It was marketing purposes [*sic*]." Zendusa acknowledged that two of Flood Specialists' company trucks displayed both Flood Specialists' and Platinum Touch's logos for marketing purposes, but he denied that the companies utilized any banners at job sites listing both companies' logos.

¶ 52    Zendusa testified that MV Prop was "a company that *** [he and Mario] started that [they] were going to try to do work through." However, things "did not work out, so basically it was a company that [Zendusa] had group health insurance for [his] family [*sic*]." Zendusa agreed that "MV Pro[p] [stood] for Mario Vincent Property." The two "flipped" one property under MV Prop, which did not earn any "net proceeds" for the company. Zendusa could not remember when they

had "flipped" the home. When asked whether Zendusa and Mario had shared "ownership in any entity at all," Zendusa stated, "Yes, MV Pro[p]."

¶ 53    Zendusa testified that "Marvin Green [was] a marketing [*sic*] for the energy efficient homes [he] built." He denied that Mario had any involvement with the company. He further denied that he took any business trips with Mario to learn more about energy efficient homes, or that Mario had purchased a "Ford van from Arlington Heights Ford in the amount of approximately $32,000 that Marvin Green currently uses." He did acknowledge taking a trip to California, perhaps in April 2019, in order to "look[] at some solar equipment," but not "specifically for Marvin Green, *** just solar in general." Zendusa testified that he would be surprised to learn that Mario used a "Marvin Green email address."

¶ 54    Following Zendusa's testimony, both parties rested.

¶ 55                              C. Posttrial Proceedings

¶ 56    On January 10, 2022, before the court issued its judgment, Jolanta filed her petition of abuse of allocated parenting time, arguing that Mario violated certain portions of the trial court's previous, allocated judgment as to parental responsibilities.

¶ 57    On January 27, 2022, the trial court entered its judgment for dissolution of marriage. According to the judgment, "[t]he parties agreed prior to trial that neither party would be awarded maintenance," and, "[t]hat being said, in reaching a maintenance determination, the court considered all of the evidence and testimony presented as well as the statutory factors set forth in Section *** 5/504" of the Act (750 ILCS 5/504 (West 2020)) and found that, "consistent with the parties' agreement" and "[p]ursuant to statute," neither party would be awarded maintenance. The judgment suggested that such a prohibition on maintenance was permanent, providing that "[m]aintenance to either party is barred in accordance with the provisions of this [j]udgment."

¶ 58    The judgment generally awarded Jolanta 55% of the parties' marital assets, with Mario receiving the remaining 45%. The judgment noted that Mario held "six bank accounts at Chase, namely a business checking account ending in X5080, a business checking account ending in X5218, a business checking account ending in X5512, a business checking account ending in X6120, a business checking account ending in X7342, and a personal checking account ending in X5836." These accounts were awarded to Mario. Jolanta was awarded two of her own personal Chase accounts as well.

¶ 59    The court generally ordered that Jolanta would receive 45% of the parties' marital debt, with Mario receiving the remaining debt.

¶ 60    On February 14, 2022, Jolanta filed her notice of appeal as to the trial court's January 27, 2022, judgment of dissolution. On June 9, 2022, the court denied Jolanta's petition for abuse of allocated parenting time, which had remained pending. On June 17, 2022, Jolanta filed her notice of appeal as to the trial court's decision as to that petition, believing the second notice of appeal was required to perfect our jurisdiction over her earlier notice of appeal. On June 28, 2022, this court consolidated both appeals.

¶ 61                              II. ANALYSIS

¶ 62    On appeal, Jolanta raises no arguments as to the trial court's June 9, 2022, denial of her petition for abuse of allocated parenting time, despite having specifically appealed that order. Instead, Jolanta argues that: (1) the trial court misapplied section 503 of the Act when it found her notice of intent was untimely; (2) the trial court misapplied section 504 of the Act to bar her from receiving or seeking maintenance; and (3) the trial court abused its discretion in failing to value and allocate "certain marital assets of the parties." We address these issues in turn.

¶ 63                              A.  Dissipation

¶ 64    First, Jolanta argues that the trial court misapplied section 503 of the Act by barring her "claim of dissipation as untimely, notwithstanding the fact that it was filed within 30 days of the close of discovery." "Dissipation is one of the factors in section 503(d) of the Marriage Act that a trial court must consider in allocating marital property equitably in just proportions." *In re Marriage of Schneeweis*, 2016 IL App (2d) 140147, ¶ 33; see also 750 ILCS 5/503(d)(2) (West 2020). Dissipation is defined as the " 'use of marital property for the sole benefit of one of the spouses for a purpose unrelated to the marriage at a time that the marriage is undergoing an irreconcilable breakdown.' " *Id.* (citing *In re Marriage of O'Neill*, 138 Ill. 2d 487 (1990)).

¶ 65    Pursuant to section 503(d)(2)(i) of the Act, "a notice of intent to claim dissipation shall be given no later than 60 days before trial or 30 days after discovery closes, whichever is later." 750 ILCS 503(d)(2)(i) (West 2020). This notice "shall contain, at a minimum, a date or period of time during which the marriage began undergoing an irretrievable breakdown, an identification of the property dissipated, and a date or period of time during which the dissipation occurred." 750 ILCS 5/503(d)(2)(ii) (West 2020). Where a notice of intent to claim dissipation complies with section 503(d)(2)'s requirements and allows the opposing party a fair opportunity to refute the claim, the notice is timely, and the question of dissipation should be considered by the court. *In re Marriage of Hamilton*, 2019 IL App (5th) 170295, ¶ 77. While the question of whether dissipation has occurred is reviewed under a manifest weight of the evidence standard, the distinct question of whether a notice of intent to claim dissipation complied with applicable law is reviewed *de novo*. *In re Marriage of Vancura*, 356 Ill. App. 3d 200, 204 (2005); *Hamilton*, 2019 IL App (5th) 170295, ¶¶ 73-77 (appellate court tacitly applied *de novo* review in determining whether notice of dissipation complied with statutory timelines); see also *Huber v. American Accounting Ass'n*, 2014

IL 117293, ¶ 9 (legal question of whether notice of appeal was timely was subject to *de novo* review).

¶ 66    For example, in *Hamilton*, the respondent in a dissolution action sought to bring a claim of dissipation during trial, approximately a month after discovery had already closed. *Id.* ¶¶ 11, 59. When the issue was raised at trial, the trial court pointed out that the respondent's dissipation claim was untimely, and the parties moved onto other matters. *Id.* ¶ 60. Three days later, presumably before the trial had concluded, the respondent filed a notice of intent to claim dissipation of marital assets, in which she asserted that the petitioner dissipated a total of $97,788 in marital funds over several years while the marriage was irretrievably broken. *Id.* ¶ 61. Discovery was thereafter reopened, and the matter was continued for almost a year. *Id.* ¶ 62.

¶ 67    At a subsequent hearing, the topic of the petitioner's dissipation arose again, and, after the matter was continued again, a final hearing was held on the respondent's dissipation claim. *Id.* ¶¶ 61-63. The trial court ultimately found that respondent had failed to make a *prima facie* case of dissipation, and the respondent appealed. On appeal, the petitioner argued that the respondent's notice of intent to claim dissipation was untimely. *Id.* ¶¶ 72, 73.

¶ 68    The appellate court first found that the respondent's initial notice was filed within the timelines set forth in section 503(d)(2)(i) of the Act, suggesting that it was timely. *Id.* Still, in recognition of the petitioner's argument that the notice was nonetheless untimely because it was filed after trial had already began, the appellate court ceded that "there are circumstances under which it would be unfair to require a party to refute a claim of dissipation raised after the start of trial[,] even if the other party complied with [section 503(d)(2)(i)]." *Id.* ¶ 74. However, there, where the petitioner had almost a year to conduct discovery as to any claims of dissipation, and where the respondent had filed her notice of intent to claim dissipation over a year prior to the final

hearing on the subject, the appellate court found that the petitioner had ample opportunity to address the respondent's claims. *Id.* ¶¶ 74-77. Accordingly, the appellate court found that the notice of intent to claim dissipation was timely, as it complied both with section 503(d)(2)(i) and traditional notions of fairness. *Id.*

¶ 69    Here, Jolanta argues that, because her notice of intent was timely under section 503(d)(2)(i), and because Mario had sufficient notice that "dissipation would be an issue as early as December 4, 2019," the trial court erred in barring her dissipation claims as untimely. In support of these contentions, Jolanta specifically argues that her notice of intent—which was filed on August 30, 2021—was filed well within 30 days of the close of discovery, as the trial court's August 9, 2021, order specified that discovery would be extended to August 23, 2021. Concerning the issue of fairness, Jolanta points out that, while her notice of intent was filed shortly before trial, "Mario knew dissipation would be an issue as early as December 4, 2019, when the trial court entered a Rule 218 Case Management order listing 'Dissipation by Petitioner' as a contested issue." Jolanta also argues that her fourth petition for rule to show cause and several other of her filings all conferred constructive notice of Jolanta's impending dissipation claims to Mario.

¶ 70    In response to Jolanta's contentions, Mario argues that, pursuant to the trial court's January 21, 2021, order, discovery closed on July 15, 2021, meaning Jolanta's notice of intent was untimely under section 503(d)(2)(i). Mario further contends that, here, where he received the notice of intent two days before trial was scheduled and where he had never previously been informed of the details as to any specific dissipation claim, Jolanta's notice of intent did not comply with *Hamilton's* fairness requirement.

¶ 71    Here, the trial court did not err in finding that Jolanta's notice of intent was untimely under section 503(d)(2)(i). Under our supreme court's rules, trial courts are invested with broad powers

to supervise any or all part of the discovery procedure. Ill. S. Ct. R. 201(c)(2) (eff. May 29, 2014). As part of this authority, trial courts have discretion to determine whether to reopen discovery. *Ruane v. Amore,* 287 Ill. App. 3d 465, 471 (1997). Again, the Act requires that "a notice of intent to claim dissipation shall be given no later than 60 days before trial or 30 days after discovery closes, whichever is later." 750 ILCS 503(d)(2)(i) (West 2020).

¶ 72    Here, while Jolanta argues that the trial court's August 9, 2021, order operated to reopen discovery through August 23, 2021, meaning her notice of intent was timely under section 503(d)(2)(i), the trial court did not err in reaching the opposite conclusion. Consequently, Jolanta cannot rely on the August 9, 2021, order to establish the timeliness of her notice of intent. In analyzing the timeliness of the notice, we turn first to Jolanta's motion to continue trial—the hearing of which formed the impetus behind the court's August 9, 2021, order—to determine the context of the August 9, 2021, order. In her motion to continue trial, Jolanta articulated her frustration over Mario's and several other parties' failures to respond to discovery requests or subpoenas that Jolanta had already issued. For instance, in her motion, Jolanta argued that Mario failed to "[s]easonably [s]upplement or [a]mend" certain discovery responses that she had previously tendered to him, necessitating a trial continuance. Following a hearing on that motion, which, again, is absent from the record, the trial court entered its August 9, 2021, order, requiring Mario to turn over certain financial documents "*as previously court-ordered*" and certain *supplemental* discovery responses. (Emphasis added.) The order further allowed the parties to "conduct depositions" through August 23, 2021, which, in light of the missing hearing transcript, we deduce was in relation to the unanswered subpoenas referenced in Jolanta's motion.

¶ 73    Considering the allegations in Jolanta's motion to continue in tandem with the relief provided in the court's August 9, 2021, order, we are left with the conclusion that, in entering the

order, the court did not intend to reopen discovery by allowing the parties to freely conduct new discovery, but instead, sought to enforce compliance with Jolanta's *previously tendered* discovery requests, in order to maintain the August 30, 2021, trial date. Indeed, while analyzing the timeliness of Jolanta's notice of intent, the court suggested that its August 9, 2021, order was meant to facilitate "the updating of previously tendered discovery," but never opined that the order was designed to reopen discovery. This conclusion is bolstered both by the fact that Jolanta's motion to continue trial contained no requests for the court to reopen discovery, as well as the fact that the trial court—which is in the best position to interpret its own orders—found that the August 9, 2021, order did not reopen discovery. *Wilson v. Humana Hospital*, 399 Ill. App. 3d 751, 762 (2010). Further to this point, we again note that Jolanta has failed to provide us with transcripts from the August 9, 2021, order to establish a different context behind the August 9, 2021, order, leaving us with the presumption that the trial court's characterization of the order was in conformity with the law. *Foutch v. O'Bryant*, 99 Ill. Ill. 2d 389, 392 (1984); *In re Marriage of Gabriel and Shamoun*, 2020 IL App (1st) 182710, ¶ 37.

¶ 74    We further find that Jolanta's notice of intent did not comport with *Hamilton's* fairness requirement, meaning the notice was not timely. *Id.* Again, Jolanta's notice was tendered to Mario two days prior to the parties' tentative trial date and filed on the parties' scheduled trial date. Although trial actually commenced on September 8, 2021, Mario was still left with only 11 days to prepare responses to the 15 instances of dissipation alleged in Jolanta's notice, which involved three different banking accounts, different business entities, and approximately $455,428 to be accounted for. These circumstances are completely distinct from those in *Hamilton*, in which the petitioner had over one year to respond to the respondent's dissipation claims. Because Jolanta's notice of intent did not provide Mario with enough time to meaningfully respond to her claims of

dissipation, it was not timely under *Hamilton*, and the trial court correctly barred Jolanta from arguing dissipation at trial. *Id.*

¶ 75     Pointing to language from the record in which the court found Jolanta had "no good reason" for delaying her dissipation claims, Jolanta further argues that the trial court relied on an improper standard in barring her claims. Otherwise put, Jolanta argues that the issue of whether her notice of intent was timely does not hinge on whether she had any "good reason" for delaying the claims. Because Jolanta's argument distorts the record, we disagree.

¶ 76     Here, the record demonstrates that the court considered traditional notions of fairness in determining whether Jolanta should be able to claim dissipation, similar to the *Hamilton* court. *Id.* Still, even if the court did hypothetically utilize an incorrect standard, we may affirm the trial court for any basis appearing within the record, no matter the particular reasons given by the trial court. *Akemann v. Quinn*, 2014 IL App (4th) 130867, ¶ 21. Regardless of the standard utilized by the court, Jolanta's dissipation claims were properly barred because her notice of intent was untimely under the language of section 503(d)(2)(i) and unfairly left Mario with insufficient time to meaningfully respond to them.

¶ 77     Jolanta further argues that prior filings in this case provided Mario with constructive notice of her impending dissipation claims. In support of this argument, Jolanta first points to the trial court's December 4, 2019, case management order, which specified that dissipation claims remained pending between the parties. However, the order did not identify any allegedly dissipated assets or alleged dates on which dissipation occurred, as required for there to be proper notice under section 503(d)(2)(ii). Therefore, the order could not have aided Mario in preparing any type of defense to the numerous, specific dissipation claims outlined in Jolanta's August 30, 2021, notice of intent.

¶ 78     Jolanta argues that constructive notice of her dissipation claims can further be found in: (1) her July 2, 2020, petition for rule to show cause, which mentioned her need to retain experts to trace Mario's dissipation of marital assets; (2) her September 28, 2020, response to Mario's petition to modify, which referenced the need to explore Mario's dissipation through discovery; (3) her December 1, 2020, emergency motion to inventory Flood Specialists, in which she alleged that Mario was allowing dissipation of the marital estate; and (4) her December 28, 2020, petition for interim and prospective attorneys' fees and costs, which alleged that Mario had dissipated certain assets—without naming those assets—throughout 2019 and 2020.

¶ 79     Like the trial court's December 4, 2019, case management order, none of these motions and petitions included sufficient details to appraise Mario of the details of her dissipation claims, unlike her actually filed notice of dissipation. In fact, at least two of the filings Jolanta references did not even indicate that she had identified any dissipation, but rather, they only contended that Jolanta required further resources or time to discover Mario's alleged dissipation. Accordingly, these filings did not afford Mario with constructive notice that would enable him to defend himself against Jolanta's claims.

¶ 80     Nevertheless, Jolanta points to several cases in arguing constructive notice, but her cited cases are all inapposite, as they involve entirely distinct facts, were silent as to the issue of fairness, or were decided prior to the enactment of Pub. Act 97-941, § 5 (eff. Jan. 1, 2013) (amending 750 ILCS 5/503(d)(2)), which added the requirement of a notice of intent for dissipation claims. *Vancura*, 356 Ill. App. 3d 200 (pre-amendment case where court *sua sponte* raised the issue of dissipation); *In re Marriage of Brown*, 2015 IL App (5th) 140062, ¶¶ 60-62 (pre-amendment case determining whether dissipation claim was waived); *In re Marriage of Davis*, 215 Ill. App. 3d 763 (pre-amendment case determining whether dissipation claim was waived).

¶ 81    In her reply brief, Jolanta argues for the first time that *Hamilton's* fairness requirement is not provided for in the language of section 503(d), and that, therefore, we should only consider whether her notice of intent was timely under the express language of section 503(d), regardless of any notions of fairness. Because Jolanta did not make this argument in her opening brief, it is forfeited.  Ill. S. Ct. R. 341(h)(7) (eff. Oct. 1, 2020). Waiver aside, the legislature is presumed to be aware of judicial decisions interpreting legislation. *Pielet v. Pielet*, 2012 IL 112064, ¶ 48. Where a judicial decision has not provoked an amendment, the legislature is seen to acquiesce to the decision. *Id.*  Accordingly, because the legislature has not amended section 503(d) in light of the *Hamilton* court's findings, we presume that the legislature acquiesced in those findings, bolstering our conclusion that, in order to be considered timely, a notice of intent to claim dissipation must comply with section 503(d)(2)(i) *and* meet the fairness test outlined in *Hamilton*. Regardless, even if we were to ignore *Hamilton's* fairness requirement, as we have found above, Jolanta has not established that her notice of intent was timely under section 503(d)(2). For all of these reasons, we find that the trial court did not err in barring Jolanta's dissipation claims.

¶ 82                                    B. Maintenance

¶ 83    Next, Jolanta argues that the trial court erred in barring her from ever receiving maintenance from Mario, regardless of the parties' respective future circumstances. "In a proceeding for dissolution of marriage *** the court may grant a maintenance award for either spouse in amounts and for periods of time as the court deems just, without regard to marital misconduct, and the maintenance may be paid from the income or property of the other spouse." 750 ILCS 5/504(a) (West 2020). Pursuant to section 504(a) of the Act, prior to making a finding as to whether maintenance is appropriate, a court shall "consider all relevant factors," which include:

"(1) the income and property of each party, including marital property apportioned and non-marital property assigned to the party seeking maintenance as well as all financial obligations imposed on the parties as a result of the dissolution of marriage;

(2) the needs of each party;

(3) the realistic present and future earning capacity of each party;

(4) any impairment of the present and future earning capacity of the party seeking maintenance due to that party devoting time to domestic duties or having forgone or delayed education, training, employment, or career opportunities due to the marriage;

(5) any impairment of the realistic present or future earning capacity of the party against whom maintenance is sought;

(6) the time necessary to enable the party seeking maintenance to acquire appropriate education, training, and employment, and whether that party is able to support himself or herself through appropriate employment;

(6.1) the effect of any parental responsibility arrangements and its effect on a party's ability to seek or maintain employment;

(7) the standard of living established during the marriage;

(8) the duration of the marriage;

(9) the age, health, station, occupation, amount and sources of income, vocational skills, employability, estate, liabilities, and the needs of each of the parties;

(10) all sources of public and private income including, without limitation, disability and retirement income;

(11) the tax consequences to each party;

(12) contributions and services by the party seeking maintenance to the education, training, career or career potential, or license of the other spouse;

(13) any valid agreement of the parties; and

(14) any other factor that the court expressly finds to be just and equitable." 750 ILCS 5/504(a) (West 2020).

"In considering these factors, the trial court is not required to give them equal weight 'so long as the balance struck by the court is reasonable under the circumstances.' " *In re Marriage of Nord*, 402 Ill. App. 3d 288, 293 (2010) (quoting *In re Marriage of Miller*, 231 Ill. App. 3d 480, 485 (1992)). The standard of review governing a maintenance order is whether the order constituted an abuse of discretion, or whether the order's factual predicate was against the manifest weight of the evidence. *In re Marriage of Bates,* 212 Ill. 2d 489, 523-24 (2004). "In other words, if the court's exercise of discretion has an evidentiary basis, then the reviewing court will consider the manifest weight of the evidence." *Id.*

¶ 84　　Here, Jolanta argues that the trial court erred by barring Jolanta from ever receiving maintenance because it based its decision on an erroneous belief that the parties agreed to waive maintenance, and because it failed to consider all the relevant factors under section 504 of the Act. Jolanta further posits that her prior status as M.M.'s primary caretaker, her impaired ability for future earnings, and Mario's higher income earning potential were all ignored by the court while determining maintenance.

¶ 85　　Mario, on the other hand, argues that the trial court did not err in barring Jolanta from receiving maintenance, as it was not required to consider each and every factor under section 504. Mario nonetheless asserts that the court employed a "thorough consideration[] of the factors set forth in [s]ection 504(a)," and that the evidence contained within the record supports the trial

court's decision. For these reasons, Mario contends that, even if the court erred in basing its maintenance determination on a nonexistent maintenance agreement between the parties, any such error was harmless.

¶ 86    Here, because the trial court's maintenance determination was based on an erroneous belief that the parties agreed to waive maintenance, we agree with Jolanta that the determination was against the manifest weight of the evidence. Again, in barring the parties from ever receiving maintenance from one another, the court provided in its judgment of dissolution that they had "agreed prior to trial that neither party would be awarded maintenance." As Jolanta argues and as Mario implicitly concedes, the court erred in making this finding. Accordingly, it is axiomatic that the court's maintenance determination was against the manifest weight of the evidence, as it was not based on the evidence, but instead, a mistaken belief. See *Maurissa J. B. v. Ingrida K.*, 2019 IL App (2d) 190107, ¶ 45 (holding that the trial court's findings were against the manifest weight of the evidence when they were not based on the evidence presented).

¶ 87    Nonetheless, Mario argues that the trial court's error was harmless, as the record shows that the court engaged in a thorough consideration of all the applicable factors under section 504 and, relying on those factors, awarded Jolanta a higher proportion of the marital estate in lieu of maintenance. In support of this argument, Mario relies on certain testimony adduced at trial and a hearing for one of Jolanta's petitions for rule to show cause. However, even if Mario is correct that the evidence offered during the parties' trial and this hearing *elicited* pertinent evidence as to the relevant section 504 factors, this does not mean that the trial court *considered* all of the relevant section 504 factors in making its maintenance determination, as it was required to do. *Nord*, 402 Ill. App. 3d at 293; see also 750 ILCS 5/504(a) (West 2020). Again, the court's reliance on the parties' supposed agreement as to maintenance suggests the opposite, as any marital settlement

agreement as to maintenance should be enforced absent a finding of unconscionability. *Miller v. Miller*, 98 Ill. App. 3d 1084, 1088 (1981) (finding that marital settlement agreement was binding on the parties absent a finding of unconscionability). We presume the trial court was well aware of this fact, meaning the 504 factors could not have played a role in the court's decision, beyond any finding of unconscionability. *In re Jonathon C.B.*, 2011 IL 107750, ¶ 72 (there is a presumption that the trial court is aware of and acts in accordance with the law). Additionally, we identify no language in the trial court's judgment specifying that its allocation of the parties' assets was intended to supplant any maintenance award.

¶ 88    Mario also argues that, in making its maintenance determination, the court referenced the fact that Mario and Jolanta were "able-bodied and earning sufficient incomes to support themselves," and that the parties' incomes were comparable. Mario also identifies other portions of the court's judgment—pertaining to the allocation of the parties' marital property—in which the court noted the parties' earning capacities. According to Mario, these findings dealt with specific factors under section 504, and therefore establish that the court engaged in a sufficient maintenance analysis.

¶ 89    We agree that, in making its maintenance determination, the court noted that the parties were "able-bodied," and that they currently earned comparable incomes. Still, these two factual findings, which do relate to factors under section 504, were obviated by the court's mistaken belief that the parties agreed to waive maintenance. Again, where the parties in a dissolution action come to an agreement as to maintenance, that agreement should be upheld unless it is unconscionable. *Miller*, 98 Ill. App. 3d at 1088. Because we presume the court was aware of and erroneously followed this fact, we cannot say that its maintenance determination resulted from an analysis of the appropriate factors provided in section 504. *Jonathon C.B.*, 2011 IL 107750, ¶ 72. The same

can be said of the court's reference to Jolanta's decreased earning capacity, which was not actually included in the section of the judgment dealing with maintenance. Indeed, the court's decision to *permanently* bar maintenance, despite Jolanta's decreased earning capacity and Mario's increased earning capacity, again gives rise to the inference that the court based its maintenance determination on the parties' nonexistent agreement rather than their respective earning capacities.

¶ 90    Still, Mario argues that, given the court's " 'wide latitude in considering what factors to use in determining' " maintenance, it was not required to consider every single factor under section 504. While this may be true, the Act is clear that the court must consider *all relevant* factors under 504. (Emphasis added.) 750 ILCS 5/504(a) (West 2020). Again, because the court relied on a nonexistent agreement between the parties in making its maintenance determination, we cannot say that the court followed this clear mandate. Simply put, the trial court placed substantial weight on the erroneous "factor" that there was an agreement to forgo maintenance. The record does not establish this as harmless error despite Mario's attempt to convince us that because there was no sound heard in the forest that the tree really didn't fall. For all of these reasons, we agree with Jolanta that the court's maintenance determination was against the manifest weight of the evidence and remand the matter so that the court may conduct a proper maintenance analysis pursuant to the Act.

¶ 91                    C. Allocation of Marital Property

¶ 92    Finally, Jolanta argues that the trial court erred in allocating the parties' marital estate. "Before a court may distribute property upon the dissolution of a marriage, it must first classify the property as either marital or nonmarital." *In re Marriage of Faber*, 2016 IL App (2d) 131083, ¶ 3. A spouse's nonmarital property should be assigned to that spouse, while marital property should be divided "without regard to marital misconduct in just proportions." 750 ILCS 5/503(d)

(West 2020). Certain factors should be utilized in determining a just division of marital property, including:

"(1) each party's contribution to the acquisition, preservation, or increase or decrease in value of the marital or non-marital property ***;

(2) the dissipation by each party of the marital property ***;

(3) the value of the property assigned to each spouse;

(4) the duration of the marriage;

(5) the relevant economic circumstances of each spouse when the division of property is to become effective, including the desirability of awarding the family home, or the right to live therein for reasonable periods, to the spouse having the primary residence of the children;

(6) any obligations and rights arising from a prior marriage of either party;

(7) any prenuptial or postnuptial agreement of the parties;

(8) the age, health, station, occupation, amount and sources of income, vocational skills, employability, estate, liabilities, and needs of each of the parties;

(9) the custodial provisions for any children;

(10) whether the apportionment is in lieu of or in addition to maintenance;

(11) the reasonable opportunity of each spouse for future acquisition of capital assets and income; and

(12) the tax consequences of the property division upon the respective economic circumstances of the parties." *Id.*

The apportionment of marital property in each case should rely upon its own facts, and while a division of such property should be just and equitable, this does not necessarily mean that it must

be mathematically equal. *In re Marriage of Dunlop*, 294 Ill. App. 3d 768, 778 (1998). "The trial court's distribution of property rests within its sound discretion and will not be disturbed on appeal absent an abuse of that discretion. [Citation.] Such an abuse of discretion occurs only where no reasonable person would take the view adopted by the trial court." *In re Marriage of Marriott*, 264 Ill. App. 3d 23, 30 (1994).

¶ 93    Here, Jolanta argues that the trial court erred in its allocation of the following: (1) tools belonging to Flood Specialists; (2) Mario's business bank accounts; and (3) certain businesses, namely Platinum Touch, MV Prop, and Marvin Green. We address these contentions in turn.

¶ 94                                    1. Tools

¶ 95    In analyzing the court's allocation of the parties' marital property, we first agree that the court failed to allocate certain marital assets—specifically the $20,000 of tools that Mario retained from Flood Specialists—between the parties. Again, in a dissolution action, the trial court must equitably divide the parties' marital property. 750 ILCS 5/503(d) (West 2020). Marital property generally includes all property acquired by the parties subsequent to their marriage. *Id*. § 503(a).

¶ 96    Here, Jolanta argues that the trial court abused its discretion by failing to allocate Flood Specialists despite finding that the business was marital property, and despite Mario's testimony that he "continued to operate Flood Specialists at 'a personal level.' " Jolanta argues that the court further erred in failing to allocate the tools Mario retained from the business, which he testified were worth $20,000. In response, Mario argues that "the record in this matter is rife with evidence that Flood Specialists no longer existed at the time of trial," and that, as a result, the trial court had no obligation to allocate a non-existent entity. Mario further argues that, while he had testified that he continues to use to name "Flood Specialists," he does so as a d/b/a and the corporate entity Flood Specialists no longer exists. Mario makes no arguments specifically regarding the allocation

of the tools. In reply, Jolanta seemingly concedes that Flood Specialists no longer exists, but maintains that the tools Mario retained from the prior, marital business nonetheless should have been allocated.

¶ 97     We agree with Jolanta that the trial court abused its discretion in failing to allocate the tools. During trial, Mario testified that Flood Specialists was formed during the parties' marriage and agreed that it was marital property. The trial court noted as much in its judgment of dissolution and implicitly agreed with Mario by classifying the company as marital property when it allocated Flood Specialists' credit card debts amongst the parties.

¶ 98     With this in mind, at trial, Mario testified that, while most of the company's assets had been liquidated at auction, he kept $20,000 worth of company tools for himself. Given Flood Specialists' status as marital property, these tools were also marital property. Accordingly, the trial court had a duty to equitably allocate the value of those tools between the parties (*id*. § 503(d)), and its failure to do so constituted an abuse of discretion.

¶ 99                                    2. Business Accounts

¶ 100   The trial court found that Mario had six Chase bank accounts, including a personal account and five business accounts, and it awarded them all to Mario.  Jolanta raises two arguments with respect to this allocation: that allocating them all to Mario was inequitable, and that the trial court erred in failing to place a value on the accounts.  Her first argument is correct.

¶ 101    As noted above, Mario conceded that Flood Specialists was marital property, and he never testified that any of his current business interests (including his current sole proprietorship) were not marital property.  Thus, any business-related bank accounts he held were indisputably marital property.  The trial court recognized that Flood Specialists was marital property by assigning 45% of its debt to Jolanta.  To distribute Mario's business assets equitably, the trial court should also

have awarded Jolanta a portion of any business accounts. This principle applies to the accounts just as it did to the tools. The trial court offered no explanation or justification for awarding all of these accounts to Mario. This was an abuse of discretion. *Id.*; see also *Hamilton*, 2019 IL App (5th) 170295, ¶ 34 (the distribution of marital assets must be equitable).

¶ 102   Although her arguments are brief and she occasionally contradicts herself, Jolanta notes that the trial court failed to set a value on Mario's accounts, and she argues that this was an error that contributed to its failure to equitably apportion the accounts. She also at times asserts that the record did not contain any evidence about the accounts' value. Neither of these is exactly correct.

¶ 103   As Jolanta herself noted, there was **some** evidence of the accounts' value in the record. Specifically, the record contains, as a trial exhibit, a January 2020 response by Chase to a citation to discover assets that lists six accounts of Mario and/or Flood Specialists with a total value of $512,223. The record also contains a turnover order indicating that about $108,159 was taken from these accounts in February 2020.    These exhibits are evidence that, as of February 2020, Mario and Flood Specialists had over $400,000 in these accounts. Other than his own statements in his financial statement and at trial, Mario provided no evidence that the value of his six accounts was any less on the date of trial than it had been in February 2020. And although Mario's testimony was impeached in several ways, even he conceded that the accounts had at least some value. Mario's financial statement acknowledged the existence of three bank accounts and asserted that they had a total value of about $12,000, although he did not specify which accounts he was referring to. At trial, he confirmed the existence of these three accounts (again without identifying what accounts he was speaking of) and gave their collective value as about $9,778.

¶ 104   The trial court thus did have evidence of the accounts' value before it. The dissent suggests that the 2020 exhibits were "dated" and thus should be given less weight, but the weight to be

given each item of evidence is the trial court's province, not ours. See *In re Estate of Bennoon*, 2014 IL App (1st) 122224, ¶ 72 (the trial court "is in a superior position to observe the demeanor of the witnesses while testifying, to judge their credibility, and to determine the weight their testimony and the other trial evidence should receive."). The trial court implicitly found the Chase January 2020 listing relevant in at least some respects, finding that Mario and/or Flood Specialists had six accounts, not three as Mario claimed. The primary significance of the exhibits and Mario's testimony, however, is that the record did contain some evidence of the accounts' value. Although the evidence pointed to differing values, the trial court could choose to rely on the evidence it felt was most reliable or truthful in determining the value of the accounts. See *In re Marriage of Heroy*, 385 Ill. App. 3d 640, 664 (2008) (as finder of fact, trial court can resolve conflicting valuation evidence).

¶ 105    Further, even if the trial court did not make a finding as to the accounts' exact value at the time of trial, it still could and should have allocated those accounts equitably. See *Hamilton*, 2019 IL App (5th) 170295, ¶ 35 (although it is generally helpful for a trial court to make specific findings as to the value of large assets, the court need not value every asset). The trial court did not set an exact value of the parties' retirement accounts, either, but it did equitably apportion them 55/45 as of the date of the judgment. It could have done the same with the six Chase accounts held by Mario and/or Flood Specialists.

¶ 106    The partial dissent by our colleague asserts that Jolanta never raised the argument that the trial court failed to equitably allocate the business accounts, and that we are improperly acting as her advocate in considering the issue. That is not so. Although Jolanta's briefs focus primarily on the trial court's failure to set a value on the accounts, they also make it clear that she objected to the trial court's failure to equitably apportion the business accounts as it did the other marital

property. The very first sentence of her argument about these accounts is that "the trial court inconsistently and *improperly allocated* the financial accounts associated with Flood Specialists." (Emphasis added.) She then pointed to evidence suggesting that the accounts' value was not *de minimis* and that Mario's statements about the accounts' value were not credible. She complained that the trial court apportioned Flood Specialists' debts but not its assets—a clear example of inequitable apportionment—and contended that the trial court had not discharged its statutory "duty to equitably allocate the parties' marital estate." We did not imagine or create this argument as our colleague suggests; Jolanta raised it. She focused on the trial court's failure to assign a value to the accounts as the "original sin" that led to its failure to equitably apportion those accounts, but she did clearly argue that the trial court failed to apportion the account equitably. And although her argument on this front was far from perfect and lacked the level of citation to legal authority that our rules demand, this court may overlook forfeiture "when necessary to reach a just result or maintain a sound body of precedent." *Walworth Investments-LG, LLC v. Mu Sigma, Inc.*, 2022 IL 127177, ¶ 94. Here, those considerations militate in favor of considering Jolanta's inequitable-allocation argument.

¶ 107 The trial court here gave no explanation for its decision to award all of the six accounts to Mario. Nothing in the trial court's judgment indicates that it lacked evidence as to the accounts' value, or that (as our colleague suggests) it found the value of the accounts to be small. Nor did it find that the accounts were nonmarital. Accordingly, its failure to equitably apportion those accounts was error.

¶ 108                    3. Platinum Touch, MV Prop, and Marvin Green

¶ 109 Finally, the trial court did not abuse its discretion in omitting Platinum Touch, MV Prop, and Marvin Green in its allocation of marital assets. The Act requires a trial court to allocate only

*marital* property amongst the parties, in equitable proportions. 750 ILCS 5/503(d) (West 2020). Pursuant to the Act,

" 'marital property' means all property, including debts and other obligations, acquired by either spouse subsequent to the marriage, except the following, which is known as 'non-marital property':

(1) property acquired by gift, legacy or descent or property acquired in exchange for such property;

(2) property acquired in exchange for property acquired before the marriage;

(3) property acquired by a spouse after a judgment of legal separation;

(4) property excluded by valid agreement of the parties, including a premarital agreement or a postnuptial agreement;

(5) any judgment or property obtained by judgment awarded to a spouse from the other spouse except, however, when a spouse is required to sue the other spouse in order to obtain insurance coverage or otherwise recover from a third party and the recovery is directly related to amounts advanced by the marital estate, the judgment shall be considered marital property;

(6) property acquired before the marriage, except as it relates to retirement plans that may have both marital and non-marital characteristics;

(6.5) all property acquired by a spouse by the sole use of non-marital property as collateral for a loan that then is used to acquire property during the marriage; to the extent that the marital estate repays any portion of the loan, it shall be considered a contribution from the marital estate to the non-marital estate subject to reimbursement;

(7) the increase in value of non-marital property, irrespective of whether the increase results from a contribution of marital property, non-marital property, the personal effort of a spouse, or otherwise, subject to the right of reimbursement provided in subsection (c) of this Section; and

(8) income from property acquired by a method listed in paragraphs (1) through (7) of this subsection if the income is not attributable to the personal effort of a spouse." *Id.* § 503(a).

"The party claiming that the property is nonmarital has the burden of proof, and any doubts as to the nature of the property are resolved in favor of finding that the property is marital." *In re Marriage of Schmitt*, 391 Ill. App. 3d 1010, 1017 (2009). The trial court's classification of property as marital or nonmarital will not be disturbed on appeal unless it is against the manifest weight of the evidence. *Id.*

¶ 110  Here, Jolanta argues that the evidence adduced at trial conclusively established Mario's ownership of Platinum Touch, MV Prop, and Marvin Green, meaning the companies were marital property to be allocated.

¶ 111  Concerning Platinum Touch, Jolanta asserts that the evidence of Mario's ownership was "overwhelming," citing both the numerous instances in which he was impeached as to the subject and the November 9, 2017, check for $32,235, which Mario issued to Platinum Touch. Concerning MV Prop, Jolanta similarly argues that the evidence adduced at trial—specifically her and Zendusa's testimonies—left "no question" of Mario's ownership. Concerning Marvin Green, Jolanta lastly cites Mario's Robinhood account statement, as well as Jolanta's and Zendusa's testimony, in arguing that "[t]he only credible evidence below establishes Mario's ownership interest in this business." We disagree with all of these points.

¶ 112    Jolanta's arguments as to Platinum Touch, MV Prop, and Marvin Green are all significantly undercut by her refusal to acknowledge and explain any evidence unfavorable to her position. For example, in making her arguments regarding Platinum Touch, Jolanta neglects to mention: (1) the fact that Mario's tax returns did not reflect his receipt of any income from the company;  (2) Fala's testimony that Flood Specialists and Platinum Touch were distinct entities with different owners; (3) Dubiel's testimony that Zendusa was his current employer at Platinum Touch; and (4) Zendusa's testimony that he was the sole owner of Platinum Touch. Furthermore, no documentation of Mario's supposed ownership was entered into evidence. Indeed, even Jolanta testified that she had no knowledge of any transaction Mario completed to purchase this company.

¶ 113    To this point, Jolanta puts far too much weight on the significance of the November 9, 2017, check for $32,235. While Jolanta argues that this check constituted Mario's partial payment for Platinum Touch, this purely speculative argument defies reason. The $32,235 provided for in the check falls well short of the purported $275,000 tentative purchase price for the company. Jolanta does not identify any other checks or payments in the record that supposedly went towards this purchase price. Furthermore, the November 9, 2017, check was issued months after Mario's September 2017 deposition, in which he suggested that he had already purchased Platinum Touch. For these reasons, it seems unlikely that the November 2017 check was intended to constitute partial payment for Platinum Touch, especially considering Mario's and Fala's testimonies that it was common practice for Mario to write checks to Platinum Touch as compensation for labor and supplies.

¶ 114    The only evidence that Mario may have had an ownership interest in Platinum Touch came from Mario's repeated impeachment on the subject. To this point, while Mario's impeachment is troubling and perhaps reveals a degree of dishonesty on his part, his impeachment in and of itself

does not establish that he owned Platinum Touch. Instead, his contradicting statements between trial and his earlier depositions give rise to two possible conclusions: (1) that Mario indeed owned Platinum Touch, meaning he was untruthful during the parties' trial; or (2) that Mario did not own Platinum Touch, meaning he was untruthful during his earlier depositions. To this point, Jolanta points to nothing in the record showing that Mario's statements from his earlier depositions were any more reliable than the testimony he gave at trial. In fact, one may point to certain discrepancies between Mario's and Zendusa's prior depositions to suggest that Mario's earlier responses had been inaccurate. For instance, in Mario's September 2017 deposition, he indicated that he had already purchased Platinum Touch. In contrast, during Zendusa's later, 2018 deposition, Zendusa indicated that he still had not completed any transaction to sell the company to Mario.

¶ 115   All in all, Jolanta's arguments concerning Mario's prior depositions effectively raise questions concerning Mario's ownership of the company, but they do not provide any conclusive answers as to his ownership, as required for her to establish Platinum Touch was marital property needing to be allocated. The trial court's finding that Platinum Touch was not marital property was not against the manifest weight of the evidence, and it therefore did not abuse its discretion in failing to allocate Platinum Touch between the parties.

¶ 116   Similarly, the record is devoid of any evidence establishing that Mario held any current ownership interest in MV Prop. Jolanta cites little evidence to the contrary, and our review of the record establishes that only Jolanta testified as to Mario's continued ownership of MV Prop. However, her testimony was entirely speculative, being solely based on one-sided portions of phone calls that she overheard between Zendusa and Mario. Indeed, her vague testimony concerning Mario's alleged role within the company and the company's doings was oftentimes disjointed and confusing, demonstrating a lack of knowledge about MV Prop's organization and

financial structure. On the other hand, Zendusa—who purportedly formed the company with Mario and had first-hand knowledge of MV Prop—testified that things did "not work out" when he and Mario apparently started the company, indicating that Mario no longer held any interest in MV Prop. Jolanta testified that it was possible that Mario's involvement with MV Prop may have been temporary, agreeing that Mario may have only worked with the company while "flipping" a single home in 2018. No documents were introduced into evidence to suggest any current or past ties between Mario and MV Prop, and Jolanta did not identify any documents showing that he ever received any income from the company. While the company's name *does* appear to incorporate an amalgamation of Mario's and Vince's first names, this does not establish that Mario held any current ownership in the company. Given the lack of any evidence that Mario currently owned any interest in the company, the trial court did not err in finding that MV Prop was not marital property or in failing to allocate MV Prop between the parties.

¶ 117    Finally, the court did not abuse its discretion in failing to allocate Marvin Green between the parties, as no evidence in the record established Mario's ownership of the company, as necessary for it to be marital property. To this point, Jolanta is correct that, as adduced at trial, Mario utilized the email address, "marvingreen@icloud.com," for his Robinhood account. We also agree that Mario's half-hearted explanation that this email address was "just a name" seems dubious. Still, Mario's utilization of the email address does not necessarily mean he owned Marvin Green, especially considering that the statement listing the email address identified Mario's "employer" as "Flood Specialists," and not "Marvin Green." Again, Jolanta's theories regarding Mario's use of the email address provides us with questions concerning his ownership, but it does not provide us with any answers on the subject, as necessary to support a finding that the company was marital property.

¶ 118   Jolanta also suggests that her testimony concerning Marvin Green's operations, which was corroborated by Zendusa's testimony, established Mario's ownership of the company. Again, however, Jolanta's testimony was entirely based on overheard one-sided portions of phone conversations and was often vague and confusing, demonstrating a lack of understanding as to the company's finances and structure. We again emphasize that no testimony or documentation was introduced establishing that Mario ever received any income from the company, and aside from the Robinhood statement, no documentation tied Mario to the company in any degree.

¶ 119   On the other hand, both Mario and Zendusa—who Jolanta argues corroborated her testimony—both testified that Mario did not own the company. Fala—who was aware of Mario's and Zendusa's businesses—was unaware of any relationship between Mario and Marvin Green. In light of this evidence and the speculative nature of Jolanta's arguments, we cannot say that the trial court erred in treating Marvin Green as nonmarital, because Jolanta failed to carry her burden of showing that it was owned by Mario as required for it to be marital property. *Schmitt*, 391 Ill. App. 3d at 1017. For all of these reasons, the trial court did not abuse its discretion in failing to allocate Platinum Touch, MV Prop, and Marvin Green between the parties.

¶ 120                              III. CONCLUSION

¶ 121   For the reasons stated, we affirm the trial court's decision to bar Jolanta's dissipation claims, as well as its determination that Jolanta had not shown that Mario held any current interest in Platinum Touch, MV Prop, or Marvin Green. We reverse the portions of the trial court's judgment pertaining to maintenance and remand the matter so that the trial court may engage in a consideration of maintenance uninfluenced by the nonexistent maintenance agreement. We also find that the trial court erred in failing to equitably divide between the parties the value of the tools that Mario unilaterally retained from Flood Specialists and his business accounts, previously

awarded solely to him. On remand, the trial court must equitably allocate these marital assets between the parties.

¶ 122   Affirmed in part, reversed in part, and cause remanded with directions.

¶ 123   JUSTICE BIRKETT, concurring in part and dissenting in part:

¶ 124   I agree with the majority's decision as to the issues of dissipation, maintenance, and the allocation of Mario's tools, Platinum Touch, MV Prop, and Marvin Green. However, because the majority's analysis as to the business accounts relies on nonprobative evidence inconsistent with Jolanta's arguments, I dissent from the portion of the decision requiring the accounts to be reallocated.

¶ 125   Prior to discussing the majority's analysis as it pertains to the accounts, I replicate the entirety of Jolanta's arguments on the subject below, to provide an unbiased, contextless depiction of the arguments this court was tasked with considering. In her opening brief, underneath a title heading that reads, "The Trial Court Erred by Failing to Value Mario's Business Accounts," Jolanta argues as follows:

> "Compounding its error, the trial court inconsistently and improperly allocated the financial accounts associated with Flood Specialists in its Judgment. It awarded Mario five business checking accounts at Chase bank, without first determining the balances of those accounts. [Citation.] This becomes problematic when this Court recalls that (i) Mario only disclosed two of these five accounts on his financial affidavit [citation]; (ii) testified as to only two of their balances [citation]; and (iii) introduced evidence suggesting they collectively held in excess of $350,000 during the proceedings, even after the application of a $107,000 turnover order. [Citation.]

While the trial court awarded 100% of these Flood Specialist accounts to Mario, it effectively saddled Jolanta with half of that business's debt, ordering the payment of its credit card debts and its $100,000 line of credit from the top of the escrowed sale proceeds from the marital residence, prior to distribution. [Citation.]

Given the absence of any evidence of value of these accounts, the trial court could not have discharged its duty to equitably allocate the parties' marital estate. As the Court held in [*In re Marriage of*] *Weiss* [129 Ill. App. 3d 166, 171-72 (1984)],

['] For a trial court to apportion marital assets under section 503 of the Act, the proper value of such assets must be established. Where the record lacks proper evidence of value there is no basis upon which the appellate court can review the propriety of the trial court's apportionment of marital property.['] "

¶ 126 From this clear language, it is plain to see that Jolanta's sole contention as to the accounts was that the court erred in failing to assign value to them prior to their allocation. While it may seem obvious to point out as much, the first indicator of this interpretation can be found in the title of the argument, which, again, is *The Trial Court Erred by Failing to Value Mario's Business Accounts.*" (Emphasis added.) In conformity with this title, Jolanta's allegations describe how, in allocating the business accounts, the trial court erroneously "awarded Mario five business checking accounts at Chase bank, *without first determining the balances of those accounts.*" (Emphasis added.) Thereafter, Jolanta describes how Mario presented evidence of two of these accounts' balances, while alleging that the record suggested the accounts "collectively held in excess of $350,000 during the proceedings, even after the application of a $107,000 turnover order." These allegations show the conflicting record evidence of the accounts' balances, supporting Jolanta's contention that the trial court did not—and indeed could not—perform a proper valuation of them.

¶ 127    Jolanta next mentions that the trial court allocated 100% of the business accounts to Mario, even though it allocated to her a portion of Flood Specialists' debts. This allegation does not provide any additional argument on the subject of the accounts' allocation, as Jolanta never provided any conclusions stemming from this alleged, isolated fact. Jolanta never asserted that the court's allocation of Flood Specialists' debts rendered the allocation of the business accounts inequitable. She provided no legal authority for such an assertion. Consequently, this factual allegation seems to have been solely intended to garner sympathy from this court.

¶ 128    Jolanta then goes on to argue that, "[g]*iven the absence of any evidence of value of these accounts*, the trial court could not have discharged its duty to equitably allocate the parties' marital estate." (Emphasis added.) Otherwise put, Jolanta asserts that, because no competent evidence of the accounts' values was contained within the record, the trial court could not have possibly allocated them, as any allocation would need to be preceded by a proper valuation. This allegation basically restates the argument Jolanta made in the title of her argument. Jolanta then cites *Weiss*, 129 Ill. App. 3d at 171-172, for the proposition that a trial court must first ascribe value to an asset prior to allocating it. This citation to *Weiss* is only relevant if, as the plain text of her argument sets forth, Jolanta was indeed arguing that the trial court erred in failing to value the business accounts prior to their allocation.

¶ 129    Jolanta's reply brief is equally clear in establishing the substance of her argument. Under the argument portion of her reply brief, again entitled, "*The Trial Court Erred by Failing to Value Mario's Business Accounts*," Jolanta argues as follows:

> "*The trial court further failed to properly allocate certain accounts associated with Flood Specialists, awarding them to Mario without first determining their balances.* [Citation.] Mario points to exactly nothing in his brief which casts doubt on this point.

Putting aside the fact that he failed to disclose several of these accounts on his sworn financial affidavit, *the only evidence of their balances was woefully outdated at the time of trial.* [Citation.]

Rather than meaningfully addressing this lack of evidence, and without citation to any authority, Mario summarily concludes that the trial court had 'no choice but to simply divide the accounts as it [saw] fit.' [Citation.] *This is a gross misstatement of the law, which requires valuation prior to equitable division.* [Citations.]

Mario further offers the unsupported conclusion that these accounts only contained approximately $12,000, citing to a February 2020 order and his own financial affidavit (which disclosed two of the six accounts) as 'proof' of this fact. [Citation.] Even if Mario is correct (which he is not), *the trial court still failed to value these accounts before dividing them.* Far from being 'moot,' as he suggests, *this constitutes yet another reversible error.*" (Emphasis added.)

Once again, every single allegation from the relevant portion of her reply brief directly expresses Jolanta's view that the trial court erred by failing to value the business accounts prior to allocating them.

¶ 130 This argument, as memorialized in Jolanta's briefs, lacks merit. "For a trial court to apportion marital assets under section 503 of the Act [citation], the proper value of such assets must be established." *Weiss*, 129 Ill. App. 3d at 171. While the valuation of a marital asset constitutes a question of fact to be resolved by the trial court, a court cannot determine the value of a marital asset until the parties have presented it with relevant, competent evidence. *Hamilton*, 2019 IL App (5th) 170295, ¶ 36. "It is the obligation of the parties in a dissolution proceeding to present the court with sufficient evidence of the value of the property." *In re Marriage of Liszka*,

2016 IL App (3d) 150238, ¶ 40. "*Neither party* should be allowed to benefit on appeal from their own failure to introduce competent evidence of value at trial." (Emphasis added.) *Hamilton*, 2019 IL App (5th) 170295, ¶ 45. "Reviewing courts cannot continue to reverse and remand dissolution cases where the parties have had an adequate opportunity to introduce evidence but have failed to do so." *In re Marriage of Smith*, 114 Ill. App. 3d 47, 54 (1983) (trial court did not err in refusing to reopen case to obtain new evidence as to valuation when neither party provided competent evidence concerning valuation at trial).

¶ 131   Here, while Jolanta argues that, because no evidence was presented at trial to establish value of the accounts, the trial court erroneously allocated the accounts without first having established their value, *Liszka*, *Smith*, and *Hamilton* all conclusively establish that the failure to introduce evidence of a marital asset's value is solely attributable to the parties and not to the court. *Liszka*, 2016 IL App (3d) 150238, ¶ 40; *Smith*, 114 Ill. App. 3d at 54; *Hamilton*, 2019 IL App (5th) 170295, ¶ 45. Accordingly, it was the parties—and not the court—who erred in failing to present competent evidence of the accounts' values, and the trial court cannot be faulted for allocating the accounts in the absence of that evidence. *Id.*

¶ 132   Despite Jolanta's clear, repeated, and sole assertion that "The Trial Court Erred by Failing to Value Mario's Business Accounts," the majority asserts that Jolanta *additionally* argued that the trial court failed to allocate the accounts in an equitable proportion, similar to the manner in which it allocated the parties' other allocated assets and debts. The majority then goes on to evaluate this new argument, finding it to be meritorious.

¶ 133   As provided above, there is no language contained in any of the relevant portions of Jolanta's briefs concerning any additional arguments whatsoever. Again, the titles of Jolanta's relevant arguments, the allegations encompassing those arguments, and her legal citations in

support thereof all directly relate to the sole question of whether it was error for the trial court to allocate the accounts prior to assigning them value. In the relevant portions of her briefs, Jolanta never asserts that the trial court's allocation was in and of itself inequitable, as the majority postulates. There are no additional subheadings in the relevant portions of her briefs suggesting the existence of any supplementary arguments as to the business accounts. Jolanta never argued that the trial court was required to allocate the accounts in similar proportions as it allocated the parties' debts and remaining assets. In fact, Jolanta only mentions the parties' debts in *one sentence* of her arguments, which was unaccompanied by any legal conclusions or citations to any effect.

¶ 134 Even worse, the arguments that the majority attributes to Jolanta contradict the actual allegations that she made in her briefs. For instance, in asserting that the trial court's total allocation of the business accounts was inequitable, the majority specifies that there *was* evidence of the relevant accounts' values in the record. Specifically, the majority refers to two separate trial exhibits: (1) "a January 2020 response by Chase to a citation to discover assets;" and (2) an agreed order for turnover of funds that was filed in the 2017 lawsuit. The response to the citation to discover assets, which was filed on January 10, 2020, also originally as part of the 2017 lawsuit, lists a total of six Chase Bank accounts—totaling over $500,000—which were frozen as part of the 2017 lawsuit. The agreed order for turnover of funds, which was filed February 6, 2020, indicated that, as a result of the 2017 lawsuit, a $108,158.90 judgment would be deducted from four of the Chase Bank accounts for turnover. The majority argues that these exhibits, when taken in conjunction with one-another, evince that, "as of February 2020, Mario and Flood Specialists had over $400,000 in those accounts." *Supra* ¶ 103. Therefore, the majority postulates that the

trial court *did* have evidence of the accounts' values prior to making its allocation, requiring it to equitably allocate the business accounts.

¶ 135   While the majority ascribes this argument to Jolanta, as I have outlined above, she never argued that any evidence existed to enable to the court to value the business accounts.  Instead, she explicitly argued the contrary, that there was *no* competent evidence of the accounts' present balances, alleging, "*Given the absence of any evidence of value of these* [*Chase*] *accounts, the trial court could not have discharged its duty to equitably allocate the parties' marital estate*."   In her reply brief, Jolanta cites to both the January 2020 Chase response to the citation to discover assets and the February 2020 turnover order, arguing that the amounts listed in those exhibits were "woefully outdated" before criticizing the trial court for failing to "meaningfully address[] *this lack of evidence*." (Emphasis added.)   While the majority attempts to reconcile inconsistencies such as this by stating that Jolanta "occasionally contradict[ed] herself" while arguing of the business accounts, as evidenced from the actual, unaltered text of her arguments, Jolanta's arguments remained consistent between both of her briefs.  Instead, the majority's analysis is inconsistent with Jolanta's arguments.

¶ 136   Given the stark contrast between Jolanta's actual, meritless arguments and the arguments that the majority accredits to her, I am left with the inference that the majority seeks to advocate on Jolanta's behalf.  In my view, the majority seems to sympathize with Jolanta, reasoning that it was unfair for the trial court to allocate the business accounts—which may have contained upwards of $400,000—entirely to Mario, while simultaneously allocating to Jolanta a portion of Flood Specialists' debts.

¶ 137   This reasoning would be deeply flawed because it would rely on several faulty premises.  First, as Jolanta herself argues in contrast to the majority's analysis, the account balances implied

by the Chase response to the citation to discover assets and the turnover order were "woefully outdated" by the time of trial, meaning there is no support for the majority's implicit suggestion that, at the time of trial, the accounts totaled over $400,000. Pursuant to our supreme court, "in any dissolution proceeding[,] the valuation date for marital property is the date of trial or another date near it." *In re Marriage of Mathis*, 2012 IL 113496, ¶ 21. Here, despite our supreme court's directive in *Mathis,* the majority argues that the Chase response and the turnover order, which were filed approximately a year and a half prior to trial, provided the court with an accurate showing of the business accounts' values. However, the account balances, as memorialized in the exhibits, fail to reflect any attorneys' fees that Flood Specialists necessarily incurred as part of the 2017 lawsuit and the eviction case. The balances in the exhibits also fail to reflect that, since February 2020, Flood Specialists was severely impacted by the COVID-19 pandemic, before having to liquidate its assets and dissolving completely. Indeed, during trial, Mario's testimony that Flood Specialists currently lacked any actual value went unrebutted. Clearly, given the company's numerous legal expenses and eventual shuttering, these exhibits have little probative weight in ascertaining the values of the business accounts as they existed on the date of trial, as asserted by Jolanta.

¶ 138    On the other hand, Mario's latest financial affidavit, to which the majority assigns little probative value, was compiled almost a year and a half closer to trial than both the Chase response and turnover order. The affidavit contained the most recent evidence of Mario's finances as they existed after Flood Specialists' termination. During trial, Jolanta had ample opportunity to cross-examine Mario as to the veracity of his financial affidavit, as the record makes clear that Mario shared the relevant bank statements with Jolanta prior to trial. During a September 1, 2021, pretrial hearing, Mario informed the court that he had already provided Jolanta with "all of [his] bank

records." On September 8, 2021, while arguing his motion to bar Jolanta's dissipation claims, Mario again informed the court that he had provided Jolanta with his updated bank statements. Specifically, Mario informed the court:

> "In addition, [Jolanta]—[Jolanta's] counsel, including [Jolanta's prior counsel], had possession of all the bank records back to 2016, January of 2016, meaning they had all '16, all of '17, all of '18, all of '19."

Mario continued, further explaining that Jolanta had been made aware of Mario's various bank accounts' values going into 2020, far before Mario filed his latest financial affidavit. The trial court agreed with Mario when it barred Jolanta from bringing forth her dissipation claim. Consequently, any hypothetical allegation that Mario hid the values of the pertinent accounts is completely unsupported by the record. Despite having access to the pertinent bank records, Jolanta nonetheless failed to rebut Mario's assertions that his financial affidavit provided a more accurate accounting of his current finances than the Chase response to the citation to discover assets. For all of these reasons, Mario's latest financial affidavit seems to have been a more reliable indicator of his current financial status, and the record therefore does not support the conclusion that, by allocating the accounts entirely in Mario's favor, the trial court unfairly provided him with a $400,000 windfall.

¶ 139 Still, the majority argues that "the trial court implicitly found the Chase January 2020 listing relevant in at least some respects, finding that Mario and/or Flood Specialists had six accounts, not three as Mario claimed." *Supra* ¶ 104. While it is true that the judgment of dissolution seemingly relied on the January 2020 Chase Response in ascertaining the number of Flood Specialists' business accounts, this in no way means that the trial court found the response to be an accurate indicator of those accounts' values. To the contrary, by finding it fair to allocate

100% of the accounts to Mario, one could just as easily suggest that the trial court agreed with Mario's representation that those accounts' values had dwindled down to $12,000, as suggested by Mario's affidavit, which, again, went unrebutted at trial. In the absence of any evidence to the contrary, I presume that the trial court found such an allocation to be equitable, as Jolanta received a higher percentage of the parties' remaining marital assets.

¶ 140 The majority sidesteps this inference, asserting that "the weight to be given each item of evidence is the trial court's province, not ours." *Id.*, citing *Bennoon*, 2014 IL App (1st) 122224, ¶ 72. While this is true, the fact remains that the trial court made no affirmative findings that the account balances listed in the Chase response remained accurate at the time of trial, meaning I have not supplanted the court's determinations with my own. In fact, as the majority acknowledges, "[t]he trial court here gave no explanation for its decision to award all of the six accounts to Mario." Normally, absent a contradictory, affirmative showing in the record, we presume that the trial court acted in accordance with the law. *In re N.B.*, 191 Ill. 2d 338, 345 (2000). Here, despite the lack of findings in the record as to its allocation or the probative weight afforded towards the Chase response, the majority nonetheless suggests that the court found the response to be credible, all while finding that the court erred in its allocation. Again, I believe there is no competent support in the record for the majority's assertion. In contrast, the trial court's decision to allocate the entirety of the accounts to Mario in and of itself evinces its belief that the accounts only contained a nominal amount of money in relation to the remainder of the marital estate, which Jolanta received a higher portion of.

¶ 141 Regardless, the fact remains that, because Jolanta only argued that the court lacked evidence to properly value the accounts prior to their allocation, it is immaterial whether the Chase response or Mario's affidavit are more accurate, as any finding that there was proper evidence of

the accounts' values belies Jolanta's sole argument as to the accounts. Here, the majority has plainly found that "the record did contain some evidence of the accounts' value." *Supra* ¶ 104.

¶ 142 In sum, this case should not be decided according to the majority's ideas of fairness, or by any sense of sympathy toward Jolanta, irrespective of the arguments she actually raised. Instead, cases should be decided by the merits of the legal arguments that the parties present us with. Here, Jolanta argued that the trial court erred in failing to value the business accounts. Again, this argument lacks merit. *Hamilton*, 2019 IL App (5th) 170295, ¶ 45. This should be the end of any analysis concerning the business accounts; it is improper to otherwise analyze the equity of the court's allocation of the accounts in relation to the parties' other assets and debts, because Jolanta produced no cogent legal argument concerning as much. Therefore, this nonexistent argument is forfeited. *In re Marriage of Katsap*, 2022 IL App (2d) 210706, ¶ 139.

¶ 143 The majority disputes that the argument is forfeited, arguing that, "[a]lthough Jolanta's briefs focus primarily on the trial court's failure to set a value on the accounts, they also make it clear that she objected to the trial court's failure to equitably apportion the business accounts as it did the other marital property." *Supra* ¶ 106. As support for this interpretation of Jolanta's argument, the majority points out that "[t]he very first sentence of her argument about these accounts is that 'the trial court inconsistently and *improperly allocated* the financial accounts associated with Flood Specialists.' " *Id*. We agree that Jolanta found the allocation to be improper. Still, as the plain text of her above argument makes clear, this impropriety was *solely* based on the court's perceived failure to properly value the accounts prior to their allocation.

¶ 144 In further support of the idea that Jolanta authored this additional argument, the majority also specifies:

"[Jolanta] then pointed to evidence suggesting that the accounts' value was not *de minimis* and that Mario's statements about the accounts' value were not credible. She complained that the trial court apportioned Flood Specialists' debts but not its assets—a clear example of inequitable apportionment—and contended that the trial court had not discharged its statutory 'duty to equitably allocate the parties' marital estate.' " *Id.*

It is true that Jolanta did discuss some record evidence of the accounts' values. However, again, she did so to argue the conflicting nature of the record evidence, as support for her argument that the trial court could not have properly valued the accounts prior to their allocation. Again, the portion of Jolanta's argument in which she discusses this evidence reads:

"[*The trial court*] *awarded Mario five business checking accounts at Chase bank, without first determining the balances of those accounts.* [Citation.] This becomes problematic when this Court recalls that (i) Mario only disclosed two of these five accounts on his financial affidavit [citation]; (ii) testified as to only two of their balances [citation]; and (iii) introduced evidence suggesting they collectively held in excess of $350,000 during the proceedings, even after the application of a $107,000 turnover order. [Citation]." (Emphasis added).

Clearly, Jolanta's discussion of the pertinent evidence directly related to her argument that the trial court erred in failing to ascertain the accounts' values.

¶ 145 Moreover, Jolanta did not merely argue that "the trial court had not discharged its statutory 'duty to equitably allocate the parties' marital estate,' " as the majority articulates. Instead, the full quotation that the majority alludes to reads, "*Given the absence of any evidence of value of these accounts*, the trial court could not have discharged its duty to equitably allocate the parties'

marital estate." This portion of Jolanta's quotation, which the majority has omitted, directly contradicts the majority's interpretation of her argument, while directly supporting my position.

¶ 146  It is true that forfeiture presents a limitation to the parties and not to the court. *People v. Jackson*, 2020 IL 124112, ¶ 118. However, this is no ordinary case of forfeiture, where a party has attempted to make an argument that has been procedurally defaulted. Instead, here, Jolanta never even *attempted* to make the argument that the majority attributes to her, and, as I have explained above, the arguments she *did* present actually contradict the various premises of the majority's pertinent analysis. "[I]n the absence of clearly developed legal argument, this court will not 'act as an advocate or seek error in the record.' " *In re N.F.*, 2020 IL App (1st) 182427, ¶ 30 (citing *U.S. Bank v. Lindsey*, 397 Ill. App. 3d 437, 459 (2009)). The majority has violated this fundamental rule. While the majority's decision to advocate for Jolanta may be based on a sense of fairness, I fail to see the fairness in the majority's decision to ignore the arguments that the Jolanta has raised, to craft an argument on her behalf (based on evidence that she disputed), and to then adjudicate its own argument, all while denying Mario a meaningful opportunity to respond thereto.

¶ 147  Because I cannot endorse the majority's decision to rely on outdated evidence in order to advocate for Jolanta, I respectfully dissent.